Good morning, Anthony Longo, L-O-N-G-O. I have the defendant present at St. Frances Hospital. Thank you very much. 15 and 15, do you wish to reserve 5, 4 or some minutes for rebuttal? Yes, very well. May we proceed when we are ready? May it please the Court, I'm James Karamatis, I represent the Plaintiff Appellant. It's better to keep your voice down, we've got issues. Okay. That's just for recording that amplification. Oh, okay. Good morning, Your Honors. My name is James Karamatis, I represent the Plaintiff Appellant in this case. And we've taken appeal from the rulings of the lower court based on the dismissal of the action of voluntary undertaking on behalf of the plaintiff as well as the institutional negligence claims. This case began when... Now, what with respect to the institutional negligence claim, was that not, was there not an attempt to replead that late in the game? There was an attempt to replead it late in the game. We pled it early. However, because it didn't seem to fit squarely under the standard institutional negligence claims, we pled it without an expert and sought to obtain discovery for purposes of, providing it to our expert, which was denied by Judge Kirby. And then he gave us, he dismissed that case, that count without prejudice. And later then, through the course of the discovery process, we obtained sufficient materials and deposition testimony. And then we're able to provide those materials to our expert, who then was able to opine that there was in fact institutional negligence on behalf of the hospital. And this is 33 days before the trial date? Correct. But the problem with that is the, is, it's not, I hate to use the word fair, but I don't think it was fair to look at the trial date and then, back in the fact that we were only 33 days before the trial date. Because there was a tortured discovery process here. And it took us a while to obtain that information. And in fact, one of the last depositions was scheduled in August. And we couldn't reasonably have gotten that material to our expert within the 60-day rule. Although there was no per se waiver of the 60-day rule by the court, I mean, it could, there was certainly no prejudice to anyone to continue that trial for purposes of taking the deposition of our expert. Our disclosures were complete at that point. It was based on the depositions that we were able to obtain and other hospital policies and procedures as well. So that, when you factor in the liberal pleading requirements of Illinois, certainly should have been at least considered by the court. We do believe it was erroneously stricken at that point. We should have been able to go forward on that claim. Okay. Let's move more towards the restatement stuff that you pled. The pleading that you had referred to the voluntary undertaking pursuant to Nelson v. Union Wire Rope. Correct. The old Judge Dooley case. Correct. But this case, what happened here is the interference with the, you know, right to possess a corpse, correct? Well, and my question is, why did you cite that section of the restatement, 868? That section which stated what? The interference with the right to possess a corpse. I mean, that has been recognized as a tort in Illinois since 1914. Because essentially we did not have, I mean, it's not really, the battleground is not who had the right to possess a corpse. The corpse is that, the argument here is that the hospital undertook to bury this child with certain promises to the plaintiff. All right. I'm sorry. Go ahead. You go first. Thank you. What promises? The promises. What promises? The promises were, this must be looked at in context. She's in the hospital bed. She delivered a stillborn child. The family is there. She's considerably upset. The hospital said, you can bury the child or we can bury the child. They gave last rites to the child. They said they would bury it in a cemetery, in a marked grave. She could visit the child and bring flowers to the grave. And they would undertake to do that for her. All right. So I'm going to go back to section 868 and quote the language for you. Because I think that's what this case should have been about.    intentionally, recklessly, or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to disposition of the body. And, you know, the Mensinger case came out in 1914. And just in the past couple weeks before Judge Callahan made the ruling that ultimately resulted in the appeal here, the Fourth District came out with the case of Cochran v. Securitas on this exact topic. It's nowhere cited. Not cited in the trial court. Not cited here. You don't even have this argument on appeal that they negligently interfered with and withheld their fetus, the fetal remains from the mother who wanted to see that it was properly interred. It's, you know, why isn't that here? It's not here because our theory is that by voluntarily undertaking to, I mean, I didn't, don't just, it was in there. It was argued in 2014. Okay. This issue was argued in 2014. It may not have been denominated exactly the same way, but it was argued in 2014 that both sides had briefing on it. And then it appears to have been abandoned. We believe the stronger case here was that the hospital undertook to bury this fetus on promises made to the mother. Can you maybe tell us the elements necessary to find voluntary undertaking? What are the elements? The undertook to render services to a third person, to provide services to a third person or things, and they have a duty to exercise reasonable care in providing those services. And if, and they're liable if harm results because they did not act reasonably. And the kind of harm? And the kind of harm here is the emotional distress. But that's not what the case law and that's not what the brief statement talks about when voluntary undertaking. Those cases are all about physical harm. Well, if. This isn't physical harm. This is emotional distress, understandable emotional distress. Well, I mean, there are certain cases that do touch on this topic. The Rakosh case, for example, is a case where it's cited in the defendant's brief where the ex-wife of a deceased illegally took possession of the remains and had the remains cremated of her ex-husband and dumped the remains in her backyard. And the sons, the family, were able to maintain an action for emotional distress against not only the funeral home, but the ex-wife. I'm not talking about what your colleague is briefing. We're talking about what the plaintiff has presented to this court in order for us to try to help this cause of action get revived. Where is it? How can you tell us whether or not that argument about the interference with the right to possess the corpse, has that been waived, forfeited, is it over? And if not, why not? I don't believe it's been waived. I think the court reviews all the issues below de novo at this level. I think it was something that was argued below and not necessarily abandoned. I think it goes to the general negligence that we're discussing with respect to plaintiff's claims. Are you familiar with Brogan v. Mitchell International, Inc., 181 ill second, which makes a distinction with respect to the types of harm that you must find to have a finding of voluntary undertaking? I am somewhat familiar with that, but I think this case falls more under the Borjon case cited in our brief, which discusses a diplomat who had a lease when they failed to provide appropriate lighting, and she ended up being attacked and raped, and even though there was a lease contract that provided for certain facilities to be operable at the lease premises, they voluntarily undertook to provide better lighting and failed to do so, and I think that's analogous to this case from that standpoint. And even though there was technically a contract, we don't believe there was. Was there physical harm in that case? There was physical harm in that case. Was there physical harm in the case here? There was physical harm through, I mean, actual physical harm? Yes. To the extent that emotional distress and the fall of the family order. Has emotional distress ever been described in torts as physical harm? Well, it has been through the intentional infliction of emotional distress aspect of it, in which there's where if a party acts in total disregard and they know that emotional distress is likely to result, I think it's… Or negligent infliction. Or negligent infliction, right. And those aren't necessarily separate counts that need to be fed, there are elements of damages and negligence. Where are they in your brief? We discuss the… In our brief we do discuss as if her harm being the emotional distress that she's… That's damages. What I'm talking about is the cause of action. Cause of action is the negligence cause of action through the voluntary… breach of the voluntary undertaking. Let me ask you just a couple clean-up things in terms of going through the record. How is Zealy's name spelled? Is there a different Zealy, Zealia? Z-E-A-L-I-A. Okay. And plaintiff's mother's name? Denise, is it just D-E-N-I-S-E or is it D-E-N-E-I-S-E? It's D-E-N-I-S-E. Okay. Was there ever any discovery done on anything related to the other fetal remains that were in the same Rubbermaid container with this? We attempted to and we were denied the opportunity to do so. And there's nothing in any form that was signed by your client or any conversation that indicated that the hospital might keep this fetal remains commingled with multiple others for up to a year in the morgue? Not at all. The only thing said to my client and her family was that the child after the autopsy would be buried, which would take approximately two weeks, and that was discussed at bedside. And that was overheard. Actually, my client, I'm not even sure she even remembered it, according to her testimony, but her significant other and her mother did hear that. The hospital explained that. So the operative time period was two weeks. But I just need to impress upon the court that it's still a duty to act reasonably by the hospital, and if you represent to a plaintiff or a person that you are going to bury the child with a grave site, a headstone, and where that child can be visited, that's the voluntary undertaking. That's what was represented to the young vessel. And there's been no testimony by any of the defendants or the witnesses that indicate otherwise that they never told her that, that there's been no testimony whatsoever that what the plaintiff's position is on that issue is not true. So that's not even really disputed. Any further points you wish to make, Mr. Hermans? The – well, is the – we didn't address the Mormon doctrine or the – or the – I wouldn't worry about that. Okay. Then I have no further questions. Thank you. Mr. Longo. Good morning, and may it please the Court. My name is Anthony Longo. I represent the defendant present at St. Francis Hospital. The hospital today is asking your honors to either dismiss the appeal in full or in part or in any event affirm on the merits. I won't spend too much time on the request for dismissal because the discussion on the merits, I think, is what the Court really wants. But in the body of our brief, we explained to the Court that we felt the plaintiff made too many errors in the preparation of their appellant's brief. They violated numerous sections. You've got issues, too. The brief has issues, too, so let's not get into that. Okay. Let's just talk about the merits. Okay. Certainly. The plaintiff's notice of appeal asks this Court to consider Judge John Kirby's order and consider Judge John Callahan's order. Now, Judge Kirby's order does appear in plaintiff's notice of appeal, but there's nothing in the brief that discusses whether or gives any reason why this Court should reverse Judge John Kirby's order. There's not one argument, one Roman numeral, one case which explains why Judge John Kirby was wrong when he made his order. And so we believe that the plaintiff has waived that. Judge John Callahan's order is what plaintiffs did appeal. But when I listened to particularly Justice Laven question the plaintiff, Justice Laven raised the idea of an 868 claim and the Messinger case and the tort of interference with possession of human remains. That tort was pled in plaintiff's third amendment complaint. They had a count that alleged and was denominated interference with the possession of human remains. That claim was dismissed with prejudice by Judge John Callahan on December the 18th, and plaintiff has not appealed that order. It's not in their notice of appeal. It's not in their brief. And so there is a jurisdictional bar to this Court considering whether that tort can be revived, whether that tort can be litigated on appeal. What the Court is faced with is a plaintiff seeking relief in a very narrow fashion. The cases that we cite in our brief demonstrate that the Court must consider only the duty raised by the parties and not some other duty. The duty that plaintiff has stuck with through thick and thin in this case is the voluntary undertaking doctrine. It's been in their pleadings. It's in their appellate brief. And they insist on it today in front of your eyes. With respect to Mr. Caramaz's argument that emotional distress would suffice for the physical harm element of the voluntary undertaking, what is your response to that? It certainly doesn't. He cited case law, I believe, or a case for that proposition. I mean, if he did, I don't recall it. I think that the restatement of torts, Section 324A, clearly states that in order to have a voluntary undertaking, someone has to render services for protection of a person or their things. I stop right there, and I ask Your Honors to stop right there, because I haven't heard an argument from the plaintiff, and I don't foresee an argument from the plaintiff which would suggest that what the hospital did here was to protect the young vassal's person, her body, or her things from anything. And so I would stop reading the restatement right there before I even get to a discussion of what kind of harm is compensable or not. Unless this Court is prepared to say that the fetus was a thing of Dionne Vassal's that was in need of protection at that time, I don't think that fits. So plaintiff's chosen duty just doesn't fit definitionally. It just doesn't. And so Judge John Callahan was correct to affirm, I'm sorry, Judge John Callahan was correct to grant the motion for summary judgment, finding that there was no voluntary undertaking, nor could there ever be. But that wasn't the only reason that Judge John Callahan granted summary judgment to the defendant. There were two other bases. He was persuaded that there was no breach of any duty as a matter of law, and I understand and would concede that that's ordinarily a question of fact. But when the parties agree on those critical facts, it's appropriately a question of law. And Judge John Callahan looked at the form that had been signed by the plaintiff, concentrated on the letter. Didn't it say in that form that they're going to hold on to the fetal remains commingled with multiple others in a rubber-made container in the cooler? It doesn't contain those words exactly, Your Honor. Exactly. It doesn't. Does it contain those words at all? Well, from a legal point of view, I would say that when Let me put it this way. Sorry for interrupting. Sure. Is there anything in the testimony of the various witnesses from this Catholic hospital, from any of the pleadings, the responses, the motions, the arguments made, that would suggest that this mother was told in any way, shape, or form that her fetal remains were going to be put into a cooler with multiple others and kept for up to a year? Anything. No other than the form that she signed which said that the hospital will accomplish disposition by the terms and conditions it may prescribe. And those are the terms and conditions that there would be commingling of the fetal remains of several fetal remains? This is how a Catholic hospital, like President St. Francis, accomplishes the burden that they undertake when there is a next of kin that, for whatever reason, is not interested in handling the burial responsibilities on their own. How many did they have to have in the container before they could call the undertaker? The testimony was that the container had to be filled in order to call the undertaker. That's not what the undertaker said. He said that he'd come over to just pick up one before. Mr. Cruz, I think his name was. That was his recollection, Your Honor. But I think the court What was the magic number, how many needed to be in there? It would be a function of size. It would be a function of time. And it would be a function of expediency. You've got to understand the relationship between the hospital and the cemetery. Nobody's doing this to make a lot of money. Nobody's doing this to accomplish any sort of profit victory. What they're doing is they're trying to do their best to accomplish disposition for fetal remains that are not otherwise Can you reasonably argue that keeping these fetal remains for, what, nearly a year or a year? Can you actually argue that that's reasonable? When there is testimony that the hospital said to the mom, two weeks, and then a year later she comes back, are you reasonably arguing that what the hospital did here was reasonable? I have two responses. My first response is I put on my hat as an evidence lawyer and I say we have a contract here. And what I'm hearing from the testimony from the plaintiff after she's prepared for her deposition testimony is parole evidence, which is inadmissible. You have a contract. Where's the contract? Where's the consideration? Where's that contract? These fetal disposition notification forms, and mind you, there are two. There was the one that she signed originally to relinquish the fetal remains. Then there was a second one that she signed in order to complete the burial herself. These two forms are absolutely contracts because they contain the ingredients for contracts. Where's the consideration? The consideration would be as follows. The hospital took on a burden and a responsibility to accomplish that. Any time a party suffers an inconvenience or a burden, as cited in my brief, that's sufficient consideration to bind any contract. She was relieved of the responsibility to do what I would imagine many mothers in that circumstance do, which is call, arrange for the burial, spend money, transport, grieve, purchase items. She was relieved of that. How specific were the terms of the contract? If there's a consent form, if she consented, where's the informed consent? You're familiar with that concept, I'm sure. Well, certainly. I represent hospitals, and so I'm aware. I will tell you that this is the dynamic of the relationship. I mean, Mr. Karamanis, my friend, asks us to zero in on that hospital room and picture Dion Vassil in this situation signing these forms. I ask Dion to do the exact same thing. When we're talking about what's reasonable and timing, I want you to understand the dynamic that the hospital's main mission is to help people that come through their doors for injury and sickness and disease, and President St. Francis Hospital does that 24 hours a day. So would it have been reasonable for the hospital to say, we strive for two weeks, but it might be a year? Would that have been reasonable? And then Mom could have made maybe a better informed decision. Would that have been reasonable? Because if it is the practice that we wait until we get so many before we call Mr. Cruz, and that could take longer than the two weeks, so would it have been reasonable for the hospital to say, it could take as little as two, but we want it to happen maybe a year later? I would suggest to you that anything that the hospital said to the plaintiff in order to basically do God's work and attempt the disposition of these human remains would be reasonable. In every circumstance, quicker is better. In every circumstance, more information is better. But this form that is utilized by the hospital is provided by the Illinois Department of Public Health. And does the hospital sign it too? Does the hospital administrator sign it as well? Or is it just the mom that signs it? No, they're double signed. The form of 8811 is signed by Maureen O'Brien, who was a nurse on the floor. And then the second one is signed by the chaplain. And can the nurse bind the hospital in a contractual way? I mean, is that binding? We would never dispute that, and certainly she can. I mean, she's a point of contact caregiver. But the court's questions to me, which I appreciate, sort of envision a dynamic where there's diggering going on over terms of things, where there's an opportunity to negotiate, and that's not the dynamic the hospital faces. That's not what I'm trying to communicate here. What I'm trying to communicate is that it's hard to read this record and not think that something fell between the cracks and that they never told the mom what was going on. They just forgot about this kid. Well, the plaintiff does admit in her complaint and her deposition that she made periodic phone calls to the hospital. And during those phone calls, she wasn't misled that the baby wasn't there. Mom was aware during the passage of that time through her admitting phone calls to the hospital exactly where the baby was. The baby was at the hospital. So the mom knew throughout this entire period, even though she – and that could be wrong. You can correct me. So mom goes to attempt to pay a visit where mom believes the remains had been interred. Why did she go there if she knew the remains were still at the hospital? She went to the – I think she went to the – I think it's the local department of vital statistics or library to see if she could find a death certificate on the baby. Not to make a visit. That might have been some preparatory step to making the visit, certainly. But this is not a case, and this record does not demonstrate a case. What were the circumstances with the death certificate? When was that filled out? It was filled out by their funeral professional of choice in August of 2012, a year later. And that's doing God's work, proper procedure, a year later? I can't argue to anybody today that the death certificate was not prepared beyond the time it's required. But whether that violation serves a branch of a duty or whether that gives a cause of action, I'm confident that it does not. Well, I think you're lucky that they did not plead 868 and make it the subject of the current appeal because the Illinois Supreme Court just came down with a decision a few months ago that would put you in a very different posture. I'm aware of that, and I just repeat what I said earlier, that plaintiff's written appeals are dismissal with prejudice of that order and that there's a jurisdictional bar to this court doing anything with that respect. But I guess I would just end by saying in situations such as these, these are challenging and difficult situations for the hospital. They're not professional funeral caregivers. It's a little hard to kind of weigh the difficulty for the hospital against or balance it against the difficulty of the mom who carried a child. Indeed. And then who lost a child. Indeed. And that child should have been interred, and then she finds out subsequently that the child is in a jar, in formaldehyde, with only the child's face discernible. So it's a little hard for me to balance the difficulty that the hospital might be having. Not to suggest that the hospital isn't doing God's work. I would never suggest that. But the balancing thing is a little tough. Well, I've always disliked balancing tests, and thankfully there's none to be done today. But I just want the court to understand that in this record you may see imperfections, but they're not tortures. They happen at great places. You know, there's no question about that. Absolutely. I've committed many torts, you know, many mistakes. And I just wanted to remind the court of that.  Thank you. Thank you, Mr. Longo. Mr. Karmanis. Thank you, Your Honors. I'll be brief. I just wanted to address a couple points. First, the fetal death disposition form is not the nurse signed as a witness, just as one would sign as a consent to perform surgery and not necessarily find the hospital. The other thing is that the case below was not dismissed on the basis of failure to meet the requirements of a voluntary undertaking. But Judge – and if you look at the oral argument, Judge Callahan indicated that it was barred because of the economic loss factor. And he even made a plural evidence ruling on the mother's testimony respecting what she was told. And he held that the contract was controlling him with what motivated this fact pattern. So it wasn't really an analysis of whether a thing qualified for purposes of the voluntary undertaking, but he said that the economic loss doctrine applied. And that's what I have. Okay. Thank you. Thank you, Mr. Karmanis, Mr. Longo. The argument was well delivered. The matter will be taken under advisement and the disposition issued in due course. Thank you. Thanks.